UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FELTON GREEN, JR.                          CIVIL ACTION

VERSUS                                     NUMBER: 16-04347

NANCY A. BERRYHILL, ACTING                 SECTION: "F"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability. (Rec. docs. 10, 12).

Felton Green, Jr., Plaintiff herein, filed the subject applications for Social Security benefits on February 19, 2013, with a protective filing date of January 28, 2013, alleging disability as of January 7, 2013. (Tr. pp. 112-113, 142-144). In a "Disability Report-Adult" form that appears in the administrative record below, the conditions limiting Plaintiff's ability to work were identified as "[h]eart, hbp left foot, HBP, LEFT FOOT, DIABETES, [and] Depression." (Tr. p. 153). Plaintiff's applications for Social Security benefits were denied at the initial level of the Commissioner's administrative review process on May 23, 2013. (Tr. pp. 70-73). Pursuant to Plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on April 14, 2014 at which Plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 74, 28-47). On July 24, 2014, the ALJ issued a written decision, in which she concluded that Plaintiff was not

disabled within the meaning of the Social Security Act.  (Tr. pp. 11-27).  The Appeals Council

("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on April 5,

2016, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 1-6).  It

is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C.

§§405(g) and 1383(c)(3).

In his cross-motion for summary judgment, Plaintiff frames the issue for judicial

review as follows:

I.      The Commissioner's Finding Is Not Supported By Substantial Evidence.

(Rec. doc. 10-2, p. 6).

Relevant to the issue to be decided by the Court are the following findings made by

the ALJ:

1.  The claimant meets the insured status requirements of the Social Security
    Act through December 31, 2017.

2.  The claimant has not engaged in substantial gainful activity since January
    7, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et
    seq.*).

3.  The claimant has the following severe impairments:  a history of coronary
    artery disease; essential hypertension; and non-insulin dependent
    diabetes mellitus diagnosed in about late 2013 (20 CFR 404.1520(c) and
    416.920(c)).

4.  The claimant does not have an impairment or combination of impairments
    that meets or medically equals the severity of one of the listed impairments
    in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
    404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that
    the claimant has the residual functional capacity to perform the full range
    of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6.  The claimant is capable of performing [his] past relevant work as a security
    guard.  This work does not require the performance of work-related

activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from January 7, 2013, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. pp. 16, 18, 19, 23, 24).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries:  (1) whether substantial evidence of record supports the Commissioner's decision and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner.  *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act.  *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by

3

reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is therefore not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987). In determining whether a claimant is capable of performing the work that he has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. *Villa*, 895 F.2d at 1022; *Hollis v. Bowen*, 837 F.2d 1378, 1386 (5th Cir. 1988); *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980). The

assessment of the demands of a claimant's prior work "... may rest on descriptions of past work as actually performed or as generally performed in the national economy." *Villa*, 895 F.2d at 1022 (citing *Jones v. Bowen*, 829 F.2d 524, 527 n. 2 (5ᵗʰ Cir. 1987)). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5ᵗʰ Cir. 1987).

The medical evidence that was generated during the relevant time period[1] begins with records from the East Jefferson General Hospital ("EJGH") Emergency Department ("ED") dated January 17, 2013 where Plaintiff was seen for a complaint of shortness of breath. In the "History of Present Illness" portion of the records, Dr. Craig Caplan described Plaintiff as a 58 year-old male who had some lower abdominal pain that he attributed to a kidney stone one month earlier. In an attempt to alleviate the pain, Plaintiff had taken a dosage of Lortab and became short of breath 2.5 hours later, similar to what he had experienced when he was administered Morphine in the past. No other symptoms were present, Plaintiff was feeling better at the time of his ED visit, and he advised medical personnel that he was otherwise in a normal state of health. A systems review was completely negative and a physical examination produced unremarkable results. An EKG was performed at the time of the evaluation, which showed a right bundle branch block with no signs of ischemia, results that were not significantly different from an EKG of December

---

[1] Under 20 C.F.R. §§404.1512(d) and 416.912(d), the Commissioner is charged with developing the medical history of a DIB/SSI claimant "... for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application." (Emphasis added). As Plaintiff protectively filed his applications for Social Security benefits on January 28, 2013, and alleged disability as of January 7, 2013, which is less than 12 months earlier, the relevant time period begins with the latter date.

20, 2012. A chest x-ray and CT angiogram of the chest were also unremarkable with no evidence of acute pulmonary disease or pulmonary emboli. The impression was shortness of breath and Plaintiff was discharged home, to be followed by his primary care physician later in the week. (Tr. pp. 336-338, 342-344, 573-580, 586-589, 595).

Plaintiff was next seen at the Interim LSU Public Hospital ("ILSUPH") on January 31, 2013 for a general medical examination. He reported that his blood pressure was under control and that he was dutifully taking his prescribed medications but that he was in need of a refill on his lipidemia medicine. Upon physical examination, Plaintiff was described as an "… energetic gentleman, alert and oriented" and the results of the exam were unremarkable. The impression was a general medical examination, coronary artery disease, hypertension, and lipidemia; Plaintiff's medications were refilled. (Tr. pp. 449-451). Plaintiff returned to ILSUPH on February 25, 2013 for routine follow-up, relating the discontinuation of Zantac, which made him feel poorly, for intermittent episodes of chest pain related to his reflux and his ongoing efforts to get on the Prilosec Patient Assistance Program. Plaintiff's last negative stress test had been in July of 2012. He was not taking Metformin at the time but was reportedly making dietary changes at home. Once again, the results of a physical examination were normal. The assessment was "decently well controlled" GERD, coronary artery disease, hyperlipidemia, pre-diabetes, and "decently well controlled" hypertension. Medications were to be refilled. (Tr. pp. 452-455).

On March 8, 2013, Plaintiff was seen at the ILSUPH GI Clinic for further evaluation of his GERD/epigastric pain. A one-week trial of Nexium had resulted in the resolution of Plaintiff's epigastric pain and a significant decrease in his heartburn but he faced difficulty affording it. A physical examination was normal. The assessment was GERD versus

epigastric pain syndrome, either of which had been known to respond to Proton Pump Inhibitor ("PPI") therapy. A colonoscopy was to be scheduled and Plaintiff was directed to take over-the-counter Prilosec on a daily basis. (Tr. pp. 456-459). On March 20, 2013, Plaintiff underwent a colonoscopy at ILSUPH, during which a 7 mm. polyp was removed. Subsequent testing of the specimen revealed no evidence of dysplasia or malignancy. (Tr. pp. 460, 470). Plaintiff next presented to the ILSUPH ED on March 24, 2013, complaining of soreness in his chest when taking a deep breath and symptoms of GERD. A physical examination produced no negative findings. An EKG performed at the time was unchanged from one Plaintiff had undergone in December of 2012. As it was felt that his discomfort came about only after starting on Omeprazole, Plaintiff was to be switched to over-the-counter Pepcid in its stead. (Tr. pp. 471-475).

Plaintiff was seen at the ILSUPH Gastroenterology Clinic on April 12, 2013 where it was noted that Nexium, which Plaintiff had trouble affording, had resolved his epigastric pain within one week but that Prevacid provided no relief. A physical exam was unremarkable. The assessment was GERD versus epigastric pain syndrome (dyspepsia). Due to the persistence of symptoms despite PPI therapy, a CT scan of the abdomen/pelvis with contrast was to be scheduled after blood testing. (Tr. pp. 476-479). By May 31, 2013, Plaintiff reported that his chronic GERD-like symptoms were 65-70% improved with Zantac but that Prilosec/Nexium produced no such similar improvement. Plaintiff had missed the recommended CT scan appointment due to a death in the family. A physical exam was once again normal. The assessment was likely GERD. Plaintiff was continued on Zantac twice per day and was counseled on dietary discretion regarding foods that exacerbated his acid reflux.

(Tr. pp. 521-523).  The CT scan was eventually performed on June 7, 2013 which was essentially normal.  (Tr. pp. 524-525).

Plaintiff presented to the ILSUPH on June 23, 2013, complaining of a productive cough for seven days and following a recent diagnosis of an ear infection and being placed on a course of antibiotics after a visit to an urgent-care clinic.  Plaintiff denied chest pain and shortness of breath but he did relate feeling like he was going to pass out earlier in the day. The impression following a physical examination was "[n]o acute findings" and Plaintiff was directed to finish his course of antibiotics.  (Tr. pp. 526-532).  On June 28, 2013, Plaintiff was seen at the EJGH ED in connection with a low blood-pressure reading that he had taken himself.  Plaintiff had no symptoms at the time of the ED evaluation.  He was thus discharged home with a diagnosis of "… established high blood pressure under good control."  (Tr. pp. 605-606).  Plaintiff presented again to the ILSUPH ED on August 10, 2013 but left without being seen after triage.  (Tr. p. 533).

On August 13, 2013, Plaintiff was seen at the ILSUPH ED for abdominal/stomach pain, reporting that he had taken a considerable amount of Zantac earlier in the week due to extreme epigastric pain that he described as indigestion.  Plaintiff also complained of uncontrolled hypertension as his prescribed Lotensin made his indigestion worse and caused his feet to swell.  Chest pain and shortness of breath were denied.  A CT scan of the abdomen and pelvis was performed which revealed cardiomegaly and a fatty liver but no other acute abnormality.  An ECG was also performed which showed the right bundle branch block but no longer any T-wave changes when compared with previous testing of June 23, 2013.  (Tr. pp. 534-547).

Plaintiff returned to EJGH on August 21, 2013, reporting that he had woken up that morning with blood and clots in his mouth. Various tests were run but treatment in the ED consisted only of observation. The diagnosis was acute oral bleeding (resolved), mild hyperkalemia, and a history of diabetes. Plaintiff was instructed to follow up with his primary-care physician. (Tr. pp. 614-617, 622-626). Plaintiff was next seen at the ILSUPH Gastroenterology Clinic on August 30, 2013 for an episode of hematemesis. A CT scan was unrevealing as was a physical examination. The assessment was NSAID-associated peptic ulcer disease. (Tr. 548-550). Plaintiff underwent an upper GI endoscopy on September 4, 2013 which revealed a normal esophagus, stomach, and duodenum, establishing no obvious explanation for the episode of hematemesis two weeks earlier. (Tr. pp. 551-556).

On September 25, 2013, Plaintiff was seen again at ILSUPH for multiple complaints, including GERD-related chest pain for a number of years, right leg swelling after prolonged standing, and left knee pain that had begun two months earlier but was unaccompanied by erythema, swelling, or tenderness and was not exacerbated by movement. A physical examination revealed mild epigastric pain that was tender to palpation but the left knee had a full range of motion with no tenderness, Plaintiff's gait was intact, and he had 5/5 strength in all extremities. X-rays of the knee revealed no acute abnormalities. The assessment was GERD/chest pain; right leg swelling likely due to valvular insufficiency in the leg veins; left knee pain; coronary artery disease; hyperlipidemia; pre-diabetes; poorly controlled, home-monitored hypertension; possible PTSD; and insomnia. Plaintiff was instructed to avoid NSAID's and was to be considered for participation in the Prilosec Assistance Program. He was also continued on his other medications and was advised to take Tylenol for pain relief in addition to using compression stockings. (Tr. pp. 557-561).

Plaintiff was seen again at the Gastroenterology Clinic on October 11, 2013, having started on Prilosec the previous day.  Symptoms occurred every two to three days with no worsening and Plaintiff was attempting to lose weight, down to 264 pounds from 270 pounds.  A physical examination was normal.  Plaintiff was continued on his medications and was to exercise dietary discretion.  (Tr. pp. 562-564).  Plaintiff presented to the ILSUPH ED on October 29, 2013 with complaints of chest pain since the previous days and after waking with sharp pain localized to the left upper back that lasted 15 minutes and was rated as a "3." He later developed chest pain, at a level of "7," that was localized to the mid-chest and radiated to the left arm and was associated with lightheadedness, diaphoresis, and mild nausea with no vomiting.  Plaintiff also complained of a three-week history of intermittent bilateral knee pain and swelling that was mild in nature and did not require analgesics.  His primary symptom was nausea but there was no shortness of breath, palpitations, abdominal pain, or vomiting.  A cardiovascular exam revealed a gallop but no friction rub and a normal rate and rhythm.  On the musculoskeletal exam, Plaintiff exhibited a normal range of motion with no edema or tenderness.  Given Plaintiff's past medical history of a myocardial infarction, he was admitted for further evaluation to rule out acute coronary syndrome. Testing revealed no evidence of ischemia and Plaintiff was discharged in good condition the following day with diagnoses of coronary artery disease, hypertension, and chest pain.  He was to follow-up with his primary care physician, was to engage in activity as tolerated, and was to begin a cardiac diet.  (Tr. pp. 645-720).

Plaintiff returned to the ILSUPH ED on October 31, 2013, again complaining of intermittent chest pain unaccompanied by shortness of breath, nausea, vomiting, or diaphoresis with chest pain.  Plaintiff was in no pain at the time of his presentation and he

once again left without being seen after triage.  (Tr. pp. 756-778).  On November 7, 2013, Plaintiff was seen at the ILSUPH Ambulatory Clinic for follow-up monitoring of his chest pain. He reported that since his recent hospital discharge he no longer had chest pain.  However, his blood pressure would often spike and cause dizziness depending on the foods that he consumed.  Medications at the time included Norvasc, Claritin Reditabs, Glucophage, Nitrostat, Protonix, Pravachol, Zantac, Aldactone, and Ambien.  A physical examination was unremarkable.  The assessment was chest pain that was likely GI-related or possibly the result of a hiatal hernia.  Plaintiff was counseled on hypertension management techniques. (Tr. pp. 779-791).

Plaintiff presented to the ILSUPH ED on November 10, 2013, complaining of intermittent episodes of dizziness over the previous two weeks, each lasting several minutes and spontaneously resolving with sitting/rest.  He explained that his blood-pressure medication had been changed and that he had experienced such episodes since that time. Plaintiff also endorsed right sided ear and gum pain and some chest "tightness," with one such episode occurring that day that was non-radiating, unassociated with exertion, and lasted several minutes.  The episode resolved spontaneously with no reoccurrence and was unaccompanied by shortness of breath, palpitations, diaphoresis, or current chest pain.  A cardiovascular exam was normal but some tenderness was noted on the pulmonary/chest exam.  A complete cardiac work-up was performed.  The suspected diagnosis was dental abscess/inner-ear infection with lightheadedness and Plaintiff was ultimately discharged home in stable condition with a prescription for Amoxicillin in addition to his regular medications.  (Tr. pp. 628-634, 792-843).  Further testing was conducted at ILSUPH on November 15, 2013 and Plaintiff was instructed to drink extra fluids over the following two

days and to resume normal physical activity and a normal diet. (Tr. pp. 844-863). Further follow-up occurred at the Ambulatory Clinic on December 5, 2013, at which Plaintiff was advised of the recent test results. Plaintiff reported some relief from his dizziness since starting on Meclizine. He had experienced no further episodes of chest pain. A physical examination produced unremarkable results and it was reported that Plaintiff's GERD had resolved with medication. Vertigo was suspected. Further testing was to be scheduled and Plaintiff was to return in six weeks. (Tr. pp. 864-876).

Further follow-up monitoring of Plaintiff's knee and abdominal pain occurred at ILSUPH on December 20, 2013. Once again, a physical examination produced unremarkable results. The assessment was suspected refractory GERD versus epigastric pain syndrome (functional dyspepsia) and Plaintiff reported that PPI therapy had resulted in a resolution of his symptoms. Plaintiff was to continue on his medications and a orthopaedic referral was to be made for his bilateral knee pain. (Tr. pp. 877-886). On January 6, 2014, Plaintiff was seen for transient tooth pain resulting from a retained root tip after an extraction some years earlier. After evaluation, further extraction was performed and Plaintiff was discharged in "good condition." (Tr. pp. 887-900). Plaintiff underwent Holter monitoring at ILSUPH on January 9, 2014 which was interpreted as "normal." (Tr. pp. 901-914). Routine follow-up of Plaintiff's hypertension went forward on January 16, 2014, during which Plaintiff reported pain in the left upper quadrant and lower chest when he moved from side to side and pain when he pressed on his chest but no exertional chest pain or dyspnea. Chest pain was reproducible on physical examination but the results were otherwise normal. Plaintiff was continued on his medication regimen with low-dose aspirin to be added on a daily basis.

Further ischemic evaluation was not warranted unless Plaintiff's symptoms changed and he was to return in three months for a re-check of his lipids. (Tr. pp. 915-927).

As noted earlier, a hearing *de novo* before an ALJ went forward on April 14, 2014. After the documentary exhibits were admitted into evidence, Plaintiff took the stand and was questioned by the ALJ. He was 59 years of age at the time and had not even finished seven grades of formal education, dropping out of school to work and to care for the family that he started at an early age. Plaintiff lived in an apartment adjoining those of his ex-wife and daughter and he had driven himself to the hearing despite having a suspended driver's license. He described himself as standing at 6'1" tall and weighing 186 pounds with his normal weight being approximately 160 pounds.[2] In addition to his daughter, Plaintiff had seven other children. Plaintiff had last worked in the service department of a car dealership and had also collected unemployment benefits for a short period of time in the preceding year. Other past work experience included that as a security guard and janitorial work at a Wal-Mart. Plaintiff had stopped the service-department work as a result of swelling to his legs caused by excessive standing and the janitorial work due to extensive visits to obtain health care. The security guard work came to an end after the company went bankrupt and the business closed.

After identifying some of the medications that he was taking at the time, the ALJ took a brief recess to allow Plaintiff to collect himself. He then testified to daily, constant aches and pain to his chest and legs, swelling to his feet, and an increasingly uphill battle to address his health issues, even reportedly being "put out" of hospitals on occasion. The inability of

---

[2] The Court notes that the medical records document Plaintiff's weight as approximately 277 pounds on January 16, 2014, some three months before the hearing, and 270 pounds on April 24, 2014, 10 days after the administrative hearing. (Tr. pp. 921, 935).

medical personnel to properly diagnose and treat his conditions left him frustrated and he had adopted an attitude to simply live for the moment. (Tr. pp. 30-41).

Upon being tendered to his attorney for further questioning, Plaintiff testified to attending medical appointments once or twice per month, his last one being in January, during which the doctor initially mistook him for another patient. As was the custom, Plaintiff would be seen by a different doctor every time he presented to the hospital for medical care and who would simply send him out for new testing. Plaintiff testified that while Ibuprofen was effective for his arthritic pain, it carried adverse cardiac side effects. He further testified to occasionally using a cane "… in the morning to push start me to get out of bed," first coming to use the assistive device following an on-the-job injury in 2001 for which Plaintiff ultimately received no worker's compensation benefits. In answer to counsel's questions, Plaintiff testified that he could stand for only two hours in an eight-hour day and that negotiating stairs left him with swelling to his ankles and legs. He estimated that he could lift up to seven pounds before experiencing difficulty due to a sciatic nerve in his back. Sitting for too long, perhaps 45 minutes, reportedly caused his legs to lock up. When asked if he had to lie down during the day, Plaintiff testified that he could not fall asleep lest he wake up with severe pain under his knees. His reading skills were poor at best. (Tr. pp. 41-45).

Thomas Meunier, a VE, was the next witness to take the stand. Unfortunately, the transcript of the administrative hearing that was filed in the proceedings below is missing two pages (pages 17 and 18) which contained his answers to questions, including a hypothetical question, that were posed to him by the ALJ. What the transcript does contain is the query, posed to the VE by Plaintiff's counsel, as to whether Plaintiff could perform his

14

past work or any other work if he experienced severe pain that caused him to frequently lose his ability to concentrate on job tasks as supposedly reflected by certain cited medical records.[3/]    The VE answered that question in the negative.    Counsel then added to a hypothetical question that had been previously framed by the ALJ the requirement that Plaintiff had to lie down at least two hours during an eight-hour workday.  If that were the case, the VE testified that the Plaintiff would be unable to perform his past work or any other work.  (Tr. pp. 45-46).

The next medical records were generated on April 24, 2014 when Plaintiff was seen at the University Medical Center-New Orleans ("UMC-NO") for complaints of knot-like epigastric chest pain associated with shortness of breath.  Plaintiff related that his symptoms had resolved within 10 to 15 minutes after taking an aspirin.  These occurrences could happen at rest and had been ongoing for 15 years.  Plaintiff also related to being able to walk only four to five blocks before needing to stop secondary to shortness of breath with no chest pain but left-sided pain radiating towards the back.  The pain was not worse with exertion but was, at times, very severe and life-limiting.    However, Plaintiff was no longer experiencing dizziness or lightheadedness upon rising.    Upon physical examination, Plaintiff's heart function was normal and he had normal muscle bulk, an unrestricted range of motion, and no edema in the extremities.  The assessment was persistent chest pain of 15 years' duration which was atypical angina in nature (epigastric with radiation to the back).

---

[3/] The medical records cited by Plaintiff's counsel, which appear as pages 58 and 59 of exhibit No. 3F, document Plaintiff's visit to ILSUPH on September 24, 2012 for routine clinic follow-up care.  (Tr. pp. 430-431).  During that visit, a "new complaint" of epigastric pain was made by Plaintiff that was described as "excruciating" when it occurred, but improvement was obtained with the consumption of food and with a "GI cocktail" that was administered in the ED.  (*Id.*).  An ED workup performed at the time was negative for cardiac causes.  (*Id.*).  For such episodes of extreme pain as he complained of on this visit, it was simply recommended that Plaintiff take Maalox as needed.  (*Id.*).  In any event, September 24, 2012 falls outside the relevant time period in this case. (*See* p. 5, n. 1, *supra*).

Plaintiff was to return in one month after records from an earlier angiogram were obtained and reviewed. (Tr. pp. 929-951).

Plaintiff returned to UMC-NO for routine clinic follow-up care on May 7, 2014, with "new complaints" being identified as bilateral knee pain. In the right knee there was occasional popping, worse at night, and less severe left knee pain with no popping but continual soreness. Plaintiff reported right-sided knee swelling, not improved with heat or cold, and pain was reportedly at a level of "10" in the morning. Plaintiff had taken Aleve in the past but had been discouraged from doing so by his cardiologist and it was unclear whether pain relief had ever been obtained with Tylenol. There was also reported occasional buckling and Plaintiff avoided stairs due to pain which had been worsening over the previous three years. In terms of his hypertension, Plaintiff related occasionally going without sleep for two days in a row. Sleeping difficulties were experienced every few nights along with occasional nightmares and flashbacks from a previous accident. Plaintiff also endorsed one to two panic attacks per month, relieved by Xanax or an occasional Valium provided by his daughter. Upon physical examination, Plaintiff had soft, mild tenderness to palpation of the epigastrium but the exam was otherwise normal, with Plaintiff exhibiting a full range of motion in both the upper and lower extremities. Given the clinical history and x-ray findings, the source of Plaintiff's knee pain was thought to be osteoarthritis for which only Tylenol and physical therapy were recommended. Plaintiff's hypertension and reflux were well-controlled at the time and his statin was increased to medium potency. Anxiety/insomnia medication was to be adjusted and Plaintiff was to return for further follow-up care in 11 weeks. (Tr. pp. 952-970).

By May 22, 2014, Plaintiff reported experiencing chest discomfort "every now and then," unrelated to exertion.  A physical examination was unremarkable.  The assessment was atypical chest pain of unknown etiology as cardiac and GI workups had been negative and unrevealing.  Omeprazole was to be substituted for Zantac and Plaintiff was to return in three months.  (Tr. pp. 971-986).  He was subsequently seen at UMC-NO on June 19, 2014 after experiencing a sudden onset of left lower quadrant pain earlier in the morning along with attendant symptomology.  After evaluation, Plaintiff was diagnosed with a 4 mm kidney stone and was treated and discharged home in good condition.  (Tr. pp. 987-1042).  Plaintiff received follow-up care for that condition at UMC-NO on July 15, 2014, reporting no further abdominal pain.  However, he did complain of mild, dull back pain in the morning, mid epigastric pain at night, and muscle pain to the right shoulder.  Once again, the results of a physical examination were normal.  The impression was a 59 year-old male with a left mid ureter kidney stone in no acute distress.  A renal ultrasound was to be scheduled.  (Tr. pp. 1043-1067).

On July 16, 2014, Plaintiff was seen again at the UMC-NO ED complaining of chest pain since the previous evening in the form of epigastric pain with left upper extremity throbbing pain and slight shortness of breath.  Plaintiff felt slightly better after taking an aspirin but had poor sleep throughout the night followed by pain in the morning that was similar to his kidney stone pain.  An unidentified pain pill had resulted in improvement but recurring arm pain later returned.  Upon physical examination, Plaintiff had normal cardiovascular function but there was mild tenderness to epigastric palpation.  There was a normal range of motion throughout the musculoskeletal system.  An initial Troponin test was negative and an EKG revealed no changes.  Given Plaintiff's family history of cardiac disease and the presence of

various risk factors, he was admitted for further evaluation.  As all subsequent testing was negative, Plaintiff was discharged the following day with a diagnosis of atypical chest pain, diabetes, well-controlled hypertension, a history of cerebrovascular accident with no acute issues, and GERD that was being treated with Omeprazole.  A discharge exam was entirely normal.  (Tr. pp. 1068-1137).

The final medical records that were admitted in the proceedings below document Plaintiff's visit to UMC-NO on July 24, 2014 – the same day as the ALJ's decision – for routine follow-up care.  He recalled being recently seen in the ED for pleuritic chest pain associated with expectorating clear phlegm, especially at night.  Those symptoms had begun five weeks earlier when the weather became warmer and Plaintiff's daughter began turning up the A/C at night.  Plaintiff had not been taking his Lortadine as prescribed and cough medicine provided little relief but he had no shortness of breath, palpitations, paroxysmal nocturnal dyspnea, or orthopnea.  Fever and chills were also denied.  Plaintiff reported that his bilateral knee pain had improved with increased exercise and Tylenol and further evaluation of his kidney stone was being arranged.  However, Plaintiff had not been diet adherent due to attending multiple birthday parties and consuming quantities of leftover food and cake.  Sleeping difficulties continued and were not improved with Hydroxyzine.  A physical examination was unremarkable.  Plaintiff's medications were adjusted, he was counseled on exercise and diet management, and he was to return in 10 weeks.  (Tr. pp. 1138-1154).

Plaintiff's sole issue for judicial review is that the Commissioner's decision is not supported by substantial evidence.  Under the rubric of that broad challenge, Plaintiff argues that the residual functional capacity ("RFC") assessment that was arrived at by the ALJ failed to include certain limitations that resulted from his various impairments, "… namely that his

heart condition along with resulting pain and shortness of breath limit[ed] him to lifting no more than 10 pounds and standing no more than two out of eight hours." (Rec. doc. 10-2, p. 7). Citing a string of medical records that were admitted in the administrative proceedings below, Plaintiff asserts that he suffers from a longstanding history of coronary artery disease which consistently caused shortness of breath "attacks" requiring emergency room treatment. He additionally suffers from GERD with frequent episodes of severe epigastric pain as well as a history of hypertension, hyperlipidemia, diabetes, anxiety, and back pain causing severe functional limitations. The combined effect of these impairments, Plaintiff argues, result in the functional limitations that he testified to at the hearing before the ALJ. In light of these limitations, Plaintiff maintains that he possessed the residual functional capacity to perform only sedentary work and, in light of his age, education, and work experience, should have been found disabled under Rule 201.02 of 20 C.F.R., Pt. 404, Subpt. P, App. 2, the so-called "Grid Rules."

In the present case, the ALJ found, at step two of the §§404.1520/416.920 analysis, that Plaintiff suffered from severe impairments in the form of a history of coronary artery disease, essential hypertension, and non-insulin dependent diabetes mellitus diagnosed in the latter part of 2013.[4/] However, the mere existence or diagnosis of a condition and its related symptomology does not equate with a finding of disability under the Social Security Act. *Randall v. Astrue*, 570 F.3d 651, 658-59 (5th Cir. 2009). Rather, the appropriate inquiry is whether a claimant's impairments result in functional limitations that render him unable to perform his past work or any other work. *Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir.

---

[4/] In the Fifth Circuit, diabetes is generally considered to be a remediable condition and is therefore not disabling under the Social Security Act. *Jones v. Bowen*, 829 F.2d 524, 526-27 (5th Cir. 1987).

1990).  At step three of the five-step sequential analysis, the ALJ found that Plaintiff's impairments, while severe, did not meet or equal the criteria of any of those set forth in the Listing of Impairments.  Plaintiff does not challenge the ALJ's step two or three findings here. Having so found, the Regulations mandated that the ALJ make an assessment of Plaintiff's RFC, a term of art that embraces a claimant's ability to work despite his physical and/or mental impairments.  20 C.F.R. §§404.1520(e), 404.1545, 416.920(e), 416.945; *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988).  Just like the ultimate decision of whether or not a claimant is disabled, the responsibility for determining a claimant's RFC is reserved to the Commissioner and at the hearing level, that assessment is entrusted to the ALJ.  20 C.F.R. §§404.1527(e)(2), 404.1546(c), 416.927(e)(2), 416.946(c).  And what the law requires is that a claimant's subjective complaints of symptoms and attendant limitations, like those testified to by Plaintiff at the hearing before the ALJ, be supported by the objective evidence of record.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

Of the string of medical records that are cited by the Plaintiff, the first five (*i.e.*, tr. pp. 370, 376-378, 380, 397-398, 429-430) were generated outside of the relevant time period at issue in this case.  (*See* p. 5, n. 1, *supra*).  Turning to those records that were generated during the relevant time frame, the first of those document Plaintiff's visit to ILSUPH on January 31, 2013 during which he reported that his hypertension was "doing well" and that he was dutifully "taking his medication." (Tr. p. 449).  Indeed, the visit does not appear to have been precipitated by any adverse medical event but was rather motivated by Plaintiff's desire to obtain a refill on his medication as he "… feels well and states wants his med refill so as to continue doing well …" (*Id.*).  Upon physical examination, Plaintiff was described as an "energetic gentleman" with a regular heart rate and rhythm and normal effort and breath

sounds and who was in no respiratory distress with no wheezes, rales, or tenderness. (Tr. p. 450). Contrary to Plaintiff's representation, there is no mention of anything in the nature of a shortness of breath attack in the medical records generated on this date.

The second set of medical records cited by Plaintiff that were generated during the relevant time period document his presentation to the ILSUPH ED on March 24, 2013. Admittedly, one of the two presenting complaints was shortness of breath since the previous day but it was attributed to a possible drug interaction after Plaintiff had started a new medication, Omeprazole, 10 days earlier. (Tr. p. 471). In fact, at the time of the ED evaluation Plaintiff's shortness of breath "... ha[d] been resolved" and was described as "mild." (Tr. p. 472). A physical examination was largely unremarkable. Moreover, in the "[d]iagnosis management comments" portion of the ED records, Plaintiff was characterized as "pain free" and "comfortable" and his symptoms were felt to be GERD-related. (Tr. pp. 473-474). The third set of medical records cited by Plaintiff memorialize his brief inpatient evaluation at ILSUPH on October 29 and 30, 2013. (Tr. pp. 645-720). The particular page of those records cited by Plaintiff, page 656, contains admission and discharge diagnoses of coronary artery disease, hypertension, and chest pain and in the description of his brief hospital course shortness of breath was twice specifically denied. The medical records cited by Plaintiff thus provide little support for the argument that the ALJ, in his RFC assessment, should have imposed any limitations related to shortness of breath.

In none of the medical records that were generated during the relevant time period did any of Plaintiff's treating physicians declare that he was disabled and unable to work, a proper consideration in a Social Security proceeding like this one. *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995)(citing *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir. 1989)).

Indeed, in none of those treating physicians' records did any of his doctors place any limitations upon his activities, another important consideration. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Vaughan*, 58 F.3d at 131. After discussing and considering the rather voluminous evidence before her, the ALJ found that Plaintiff retained the RFC to perform light-level work, opining as follows:

> The medical evidence, outlined above, supports that the claimant has a remote history of cardiac complications, but with current evidence of only poorly controlled hypertension, gastric reflux/heartburn, anxiety, and hyperglycemia. Although he presented to the emergency room frequently, evaluation and diagnostic testing for chest pain and shortness of breath complaints failed to produce a significant cardiac diagnosis. Overall, the progress notes suggest gastric reflux as the primary cause of the claimant's chronic symptoms. Regardless, the evidence does not document signs or symptoms that could reasonably prevent the claimant from sustaining some type of work activity. Again, the claimant is not shown to have current evidence of coronary artery disease, ischemic heart disease, pulmonary disorder, chronic lower extremity swelling due to any cause, chronic back pain, sleep apnea, symptoms of diabetes, or chronic signs or symptoms of anxiety or depression. At best, the claimant has poorly controlled hypertension and gastric reflux due to questionable medication and diet compliance, with relatively unremarkable respiratory, cardiac, lower back, and lower extremity physical examinations.

> Based on the entire record, the claimant's combination of impairments could reasonably cause certain physical functional limitations. However, the type and/or severity of symptoms asserted by the claimant are simply not documented in the objective medical evidence. Thus, the claimant retains the ability to perform some level of full-time, sustained work. The undersigned further finds that the claimant's assertions relative to symptomatology, pain, functional limitations and restrictions on activities of daily living during the period in question are not credible in that they are exaggerated, lack corroboration or substantiation in the medical evidence, and/or are at least partially the result of the failure to follow prescribed medication and/or treatment recommendations. (20 CFR 404.1529 & 416.929 and SSR 96-7p).

> (Tr. pp. 22-23).

Faced with much of the same documentary evidence as was later presented to the ALJ, the state-agency medical consultants, highly qualified physicians with expertise in Social

Security disability evaluations whose opinions must be duly considered by the ALJ, concluded that Plaintiff retained the RFC to perform light-level work. (Tr. pp. 49-58, 59-68). 20 C.F.R. §§404.1527(e)(2)(i), 416.927(e)(2)(i). Based on a review of the body of evidence that was before her, the ALJ gave the opinions of the state-agency medical consultants great weight and similarly concluded that Plaintiff was capable of performing light work like that of a security guard, as he had done in the past. (Tr. p. 23).

In finding that Plaintiff's assertions relative to symptoms, pain, functional limitations, and restrictions were not credible to the extent alleged, the ALJ also noted his hearing testimony that he had stopped working as a security guard because the company filed for bankruptcy and went out of business (tr. p. 37), a reason unrelated to his actual ability to perform job-related functions. *See* 20 C.F.R. §§404.1566(c), 416.966(c). In a similar vein, the Court cannot help but note Plaintiff's hearing testimony that he collected unemployment benefits for at least part of the relevant time period. (Tr. p. 36). While not dispositive, contemporaneous applications for unemployment benefits and for disability benefits are inherently inconsistent and incompatible as there is no reasonable explanation for how a person seeking the latter benefits under the guise of being unable to work can simultaneously seek the former benefits claiming that he is ready and able to work. *Redwine v. Astrue*, No. 12-CV-2296, 2013 WL 3070850 at *13 (E.D. La. June 17, 2013); *Jones v. Astrue*, No. 11-CV-2288, 2013 WL 1136854 at *16 (E.D. La. Feb. 25, 2013), *adopted*, 2013 WL 1130438 (E.D. La. Mar. 18, 2013)(citing *Jones v. Chater*, 68 F.3d 467 (5th Cir. 1995)(table)). Simply put, Plaintiff failed to carry his burden of producing <u>objective</u> medical evidence supporting the limitations that he testified to at the administrative hearing. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989).

The absence of any significant findings that were revealed at Plaintiff's most recent doctor's visit on July 24, 2014 only goes to underscore the correctness of the ALJ's decision in adjudicating Plaintiff's disability status. *Clayborne v. Astrue*, 260 Fed.Appx. 735, 737 (5th Cir. 2008); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987).

## RECOMMENDATION

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[5]

New Orleans, Louisiana, this ___22nd___ day of _____June_____, 2017.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[5] *Douglass* referenced the previously-applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.

24